State ex rel. Behan vs. Judges.

## No. 8954.

THE STATE OF LOUISIANA EX REL. W. S. BEHAN, MAYOR, ET AL. VS. THE JUDGES OF THE CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS.

| | |
|---|---|
| 35 | 1075 |
| 46 | 175 |
| 46 | 835 |
| 46 | 847 |
| 35 | 1075 |
| 47 | 704 |
| 47 | 881 |
| 35 | 1075 |
| 50 | 657 |
| 35 | 1075 |
| 104 | 212 |
| 35 | 1075 |
| 117 | 646 |
| 35 | 1075 |
| e118 | 232 |

When the Supreme Court is not in session, an application for any of the remedial writs may be entertained by the Chief Justice or any of the Associate Justices.

A provisional order for any such writs thus issued by any one of the Justices is valid and binding, as though it had emanated from the Court.

Such an order is not a judgment; it is valid without the concurrence of the majority of the Judges, and need not be supported by reasons.

The power to amove a corporate officer from his office for a reasonable and just cause, is one of the common law incidents of all corporations.

The general rule is, that courts are without power or jurisdiction to impede by preliminary injunction the usual functions of a municipal corporation.

A provision in a City Charter vesting the City Council with the power to try all impeachments of City Officers, the judgment only extending to removal and disqualification to hold any corporate office, is not unconstitutional as authorizing the exercise of judicial powers by a legislative or municipal body, but it is rather the exercise of a power necessary for its police and good administration.

Courts are powerless to interfere by injunction with a municipal council in the exercise of that power. An injunction thus issued is a nullity, and will be vacated by prohibition.

ON Application for Writs of Certiorari, Mandamus and Prohibition.

---

*Chas. F. Buck*, City Attorney, *Wynne Rogers*, Assistant City Attorney, and *J. R. Beckwith* for the Relators.

*J. Ward Gurley, Jr.* and *E. H. Farrar contra:*

### I.

Courts have the authority to enjoin all illegal acts.

The power to impeach could not be bestowed upon the City Council. Constitution, Articles 14, 15, 80, 92, 196, 200 and 201 ; 31 An. 440 ; Cooley Const. Lim. 107, 211 ; People vs. Draper, 15 N. Y.; 32 An. 943 and 947 ; Story on Constitution, 796, 797, 800, 802; 11 An. 443 ; 6 Bush, Ky. R. 1; 3 Metcalf's R. 237; 28 An. 444; 19 Johnson, N. Y. 58.

### II.

A suspensive appeal does not lie from an order granting an injunction. It is a matter of right. C. P. 304 ; 29 An. 869, 796, 57 ; 30 An. 213. An improvident order granting a suspensive appeal, where none should have been granted, may be rescinded. 32 An. 814 ; 33 An. 724 ; 22 An. 35.

### III.

The supervisory control over the Civil District Court, and the power to issue thereto writs of Mandamus and Prohibition, is vested in the Supreme Court and not in a single Justice thereof. Constitution, Articles 89 and 90 ; C. P. 829, 841; 846 and 849.

---

The opinion of the Court was delivered by

POCHÉ, J. This litigation grows out of the following facts :

On the 11th of September, 1883, the Council of the City of New

Orleans preferred charges and specifications for gross neglect of, and refusal to perform, his duty, against B. T. Walshe, the City Treasurer.

The members of the Council then proceeded to organize themselves into a court of impeachment for the trial of said corporate officer, conformably to the provisions of the City Charter. Secs. 58 *et seq.*

But their proceedings were interrupted by a writ of injunction issued by Division E of the Civil District Court, restraining the Council from proceeding in the investigation of the charges preferred against the Treasurer, and prohibiting the Mayor of the City and other persons from interfering with said Treasurer in the possession and in the administration of his office.

The preliminary writ of injunction was granted at the instance of the Treasurer, and was predicated mainly on his allegation and on the District Judge's opinion, that the provisions of the City Charter which authorize the removal of city officials by impeachment by the City Council were in direct violation of the Constitution.

The parties thus enjoined, who are the relators herein, then applied for, and obtained, an order of suspensive appeal from the mandate of injunction, the said order having been granted by another Judge of the Civil District Court, acting in the absence, and in the place, of the Judge of Division E. The latter Judge, on resuming charge of his court, entertained and maintained an application for the rescission of the order for a suspensive appeal, which was alleged and held to have been inadvertently granted. An application of the relators for an order of suspensive appeal from the rescinding order just referred to was then overruled by the Judge of the lower court, whereupon relators applied to this Court for relief from the Judge's orders, alleged to be unwarranted in law and oppressive.

Their prayer for a writ of *certiorari* was declined; and it cannot be entertained, for the plain reason that the case is appealable, this writ being available only in cases where the suit is to be decided in the last resort by the subordinate court. C. P. Art. 857.

Touching the other writs invoked the following orders were made:

1. A provisional writ of prohibition, restraining the respondent Judge from enforcing the injunction which he had issued.

2. An alternative writ of mandamus commanding him to grant the order of suspensive appeal prayed for by relators, with a *proviso* that this writ was to take effect only in case of the dissolution, after final hearing of the writ of prohibition.

3. That the Judge show cause, on the first Monday of November, 1883, why the writs provisionally granted should not be made peremptory.

*First.* The point raised by the respondent Judge in his return questions the validity of the order granted, on the ground " that it was not issued by the Court, but was issued by only one of the Justices thereof, without consultation with any of the other Justices."

The position of the respondent Judge, as a guidance for the conduct of their tribunal, in dealing with remedial writs is, that under the provisions of Articles 89 and 90 of the Constitution, the Court alone, or at least a majority of the Justices concurring, could render a valid order for any of the remedial writs.

Article 89 provides that: " The Supreme Court and each of the Judges thereof, shall have power to issue writs of *habeas corpus,* at the instance of all persons in actual custody in cases where it may have appellate jurisdiction."

Article 90 reads: " The Supreme Court shall have control and general supervision over all inferior courts. They shall have power to issue writs of *certiorari,* prohibition, *mandamus, quo warranto,* and other remedial writs."

The two Articles must be construed in connection with the pre-existing provisions of the Code of Practice touching the nature, definition and scope of the writs in question, and providing the mode of proceeding in the application, the issuing and the trial of the same.

These rules of practice recognize and treat of two distinct steps or phases in the disposition of these writs. The first step is a preliminary or provisional order under which the subordinate court complained of, is apprised of the proceeding instituted with a view to test the validity of its action in the matters set forth by the relator. The second step is the final disposition of the relief sought by the complainant, after considering the return made by the respondent Judge.

The first phase in the proceeding involves the exercise of a power provisional and preliminary in its character, and, if not otherwise regulated, it is amply provided for by Art. 877 of the Code of Practice, which reads:

" The Supreme Court, as well as other courts, possesses the powers which are necessary for the exercise of the jurisdiction given to it by law, in all the cases not expressly provided for by the present Code."

The second or final act is the judgment of the court finally disposing of the controversy after full hearing of the parties, which judgment can be rendered only in open court, and cannot be rendered without the concurrence of three Judges. Const. Art. 85.

The order for a preliminary remedial writ is not a judgment or even an interlocutory decree : it adjudicates nothing, and confers no vested or irrevocable right. It is merely an incipient step towards a judicial

investigation of the matters and complaints urged in the application; it can be modified or recalled by the authority whence it emanates.

To confound it with a judgment which adjudicates on, and disposes of an issue, and finally settles a controversy, and for which reasons must be adduced under a constitutional requirement (Const. Art. 87) is a glaring fallacy repulsive to the legal mind.

. Hence it is, that these Articles of our Code of Practice have been uniformly construed as meaning that the action of the Supreme Court, or the concurrence of the majority of its Justices, is not essential to the validity of a provisional order for a remedial writ; and that such a mandate has always been viewed in our jurisprudence in the light of an order entertaining the application, and directing that notice thereof be addressed to the party or parties complained of. The construction urged by the District Judge would strike with absolute nullity all such orders rendered otherwise than in open court.

Out of term time, during the vacation of the Court, the Justices have no power to meet as a Court, or to make and issue orders and decrees as a Court. Hence it would follow, as a logical deduction from his reasoning, that during such time the remedial writs which have been incorporated in the Code of Practice and engrafted in the Constitution, in order to secure a more speedy administration of justice, would be paralyzed and temporarily obliterated, and that the wrongs which they were intended to correct would be without remedy. Such a conclusion is abhorrent to common sense, as well as to justice.

But should it be contended that the language of the Constitution, which must prevail over the provisions of the Code of Practice is peremptory in requiring the action of the Court, or the concurrence of the majority of the Justices for the purpose of issuing a valid preliminary remedial writ, the argument is answered by the plain text of the Articles 89 and 90, which, as conceded by the District Judge, must be construed together.

Article 89 unequivocally confers the power to each of the Judges to issue writs of *habeas corpus* in specified cases. Now, Article 90, after creating the supervisory jurisdiction of the Supreme Court, continues the delegation of special powers begun in Article 89, and is couched in the following significant language :

"*They* shall have power to issue writs of certiorari, prohibition, mandamus, *quo warranto*, etc." The only grammatical construction which the sentence admits of, shows that the pronoun *they* refers to the subject : "the Supreme Court and each of the Judges thereof," in the preceding Article which treats of the same subject matter. Hence, it is apparent that the power conferred by the Articles of the Code of

Practice is not only maintained in the Constitution, but on the contrary that the power has been *ex industriâ* enlarged.

Heretofore, the remedial writs could be issued in appealable cases only. Now, under the newly created supervisory jurisdiction, they are available in cases where the judgment is final in the lower court.

The construction which we give to the provisions of the Code of Practice, which regulate the remedial writs, is not only sustained on reason and principle, but it has its support in judicial authority. The point was made by another zealous litigant more than thirteen years ago, and it was settled in the same sense in the case of the State ex rel. Southern Bank vs. The Judge of the Eighth District Court of New Orleans.

We quote the following language from that decision : " When, in the progress of a suit, a necessity arises for the application of these writs, and the Supreme Court is not in session, *ex necessitate rei*, the Chief Justice or the Senior Justice present should grant the provisional order. Any other interpretation of the law would do violence to the clear intention of the law maker and to justice."

The provisional order in this case was issued by the Senior Associate Justice, when the Court was not in session, and when he was the only Justice present in the State, and our conclusion is that the order emanates from a competent authority, then vested with the whole power of the Court *pro hac vice*, including the power of coercing obedience to its mandate in case of resistance or refractory conduct on the part of those to whom it was directed.

*Second.* The second question submitted by the respondent in his return involves the justification of his acts in the premises, and it presents for solution two distinct propositions :

1. The unconstitutionality of the legislation under which the Council proposed to accuse and try the City Treasurer, which was alleged and held to be a legal ground for the injunction granted.

2. That the subordinate court had jurisdiction of the subject matter ; that its ruling therein could be reviewed on appeal only, and that therefore the writ of prohibition could not apply.

The alleged unconstitutionality of the proceedings is liable to two sub-divisions : 1st, that in organizing a court of impeachment, the City Council was usurping judicial functions, in violation of Articles 14 and 15 of the State Constitution ; 2d, that the provisions of the City Charter on the subject of impeachment were violative of the Constitution, Articles 196 and 201, which had conferred to the judiciary department the sole power of removing municipal officers.

At the threshold of the discussion, we meet a question which over-

shadows the controversy, and that involves an examination of the power of the judiciary to interfere by injunction with the operations of a municipal corporation in the exercise of its administrative functions, and more particularly that of amotion of a corporate officer.

It is of the very essence of corporations that their only mode of acting is through their officers, whose acts are regulated by law, and by the acts of incorporation.

Now, as every illegal or wrongful act of a corporate officer, cannot always be reached by the slow process of judicial proceedings, which frequently afford no adequate relief in the premises, it follows, as a necessary consequence, that the removal of the recreant officer is the only protection of the corporate body against the recurrence of similar acts, and from the damages or injury resulting therefrom.

Without the power in the corporate body of removing such obstacles in the way of its operations, the wheel of the corporation would soon become so effectually clogged, that corporate life would be eventually paralyzed, if not completely extinguished.

Hence it is, that soon after the first institution of corporations, the judiciary was called upon to define the power of such bodies for self-purification and self-maintenance in connection with the acts of unfaithful officers. And from the very nature of things the problem was solved by applying the power of amotion. The remedy was at once prescribed and used, and under numerous decisions of the Courts of England and of our sister States, it has crystallized into the following well established doctrine: " The power to amove a corporate officer from his office, for a reasonable and just cause, is one of the common law incidents of all corporations." The right has been admitted in cases where the power had not been expressly delegated, either by general law, or by special statute. Dillon's Municipal Corporations, Sec. 240.

In the early case of Rex vs. Richardson, 1 Burrows, 539, Lord Mansfield said, in speaking of this power: " It is *necessary* to the good order and government of corporate bodies, that there should be such a power as much as the power to make by-laws." Lord Coke says: " there is a tacit condition annexed to the franchise which, if he breaks, he may be disfranchised."

A similar ruling had been previously made in Lord Bruce's case, 2 Strange Reports, 819, in which a contrary doctrine which had once prevailed was reversed. Rex vs. Liverpool, 2 Burr. 723; King vs. Lynn Regis, 1 Douglass' Reports, 158; Osgood vs. Nelson, 5 English and Irish Appeals, 636.

In the case of Neall vs. Hill et al., 16 California, 146, the Court, in

recognizing this doctrine, extended it to the declaration that the power of removal of a corporate officer is vested exclusively in the corporation, subject to a revision of its action by the Courts after removal.

In the case of King vs. Richardson, 1 Burr., Lord Mansfield held, that in the absence of an express grant of authority, the corporation had the incidental power to make by-laws to remove officers for just cause.

In applying these principles to the case under discussion we find a corporation controlled by a charter recently enacted by the legislature under its general powers, and with the express authority of a constitutional provision conferring to the General Assembly full power and authority to cancel the pre-existing Charter of the City of New Orleans, and to remit its inhabitants to another form of government, if necessary. Const. Art. 254.

And in the Charter enacted under this solemn sanction, we find that the inherent power of amotion of corporate officers by the corporation is expressly recognized in principle, and is unreservedly granted in fact.

In that legislation the corporation is not left to its own inherent powers to prescribe the mode of proceeding in such cases, or to define the causes of removal, but every needed detail is amply provided for, and the extent of corporate power and the path of corporate duty are clearly mapped out.

Hence, it appears clear to our minds that, in presenting charges against the City Treasurer, and in organizing for his trial, the City Council was proceeding to exercise a power not only inherent to its existence, but expressly delegated by law.

We therefore hold, both on reason and on abundant authority, that no court of justice had the legal power to interfere by preliminary injunction with the municipal council in the exercise of that franchise, one of its plainest and most essential administrative functions. The legality or constitutionality of its proceedings in such cases is amenable to judicial action under proper showing, like all ordinances of the municipal corporation, after the exercise of municipal discretion but not before.

The general rule that courts cannot impede, by preliminary injunction, the usual functions of a municipal corporation, rests on the most solid foundation, daily strengthened by judicial assistance, and is subject to very few exceptions, where, from the nature of the act to be performed, and of the consequent, inevitable and irreparable injury to public interest, the proposed action of the corporate body may be

136

reached and controlled by the arm of the judiciary.    Dillon on Municipal Corporations, Secs. 94 and 908;   High on Injunctions, Secs. 783 and 795.

. In asserting this doctrine, the present Court, in the case of Harrison vs. City of New Orleans, 33 An. 222, said:  " Municipal corporations are clothed with legislative powers, to be exercised according to their discretion, with reference to all subjects pertaining to their adminis-. trative functions.    No injunction will lie to restrain a municipal corporation from passing or voting on any ordinance."  Slaughter House Co. vs. Police Jury of Jefferson, Opinion Book 53, p. 546.

The principle is conceded by respondent, in so far as the act of the corporation subjected to the test is technically a legislative function, but he resists the application of the doctrine to the present controversy on the ground, which is his main reliance, that the Council, in organizing a court of impeachment, was assuming the performance of judicial functions.

The argument is untenable, its inevitable consequence would strip the corporation of its inherent power of amotion of corporate officers for just cause; as any deliberation by the corporate body on the conduct of an officer, with a view to his removal if found unfaithful, would be equally amenable to the objection of judicial usurpation with the mode technically described in the City Charter as an impeachment. Armed with that argument the simple police officer, charged with der-, eliction or neglect of duty, would successfully resist, by a preliminary injunction, any investigation into his conduct and official behavior, by the City Council, or by a committee acting under its authority.

The power of amotion, as hereinabove demonstrated to be an incident of every corporation, necessarily implies an examination into the alleged causes of removal, and a concurrence of the required number of the members of the board clothed with the power of amotion, in order to effect a removal.

: Respondent's error consists in confounding this deliberation and this conclusion on the subject of removal with a judicial function, as contra-distinguished with other deliberations had and other conclusions reached by the municipal council on matters pertaining to its administrative functions.

: The question has already been subjected to judicial test, and has received the following interpretation:  " A provision in a city charter vesting the board of aldermen with the sole power to try all impeachments of city officers, the judgment only extending to removal and disqualification to hold any corporate office under the charter, is not unconstitutional as authorizing the exercise of judicial powers by a

legislative or municipal body, but it is rather the exercise of a power necessary for its police and good administration." Dillon on Municipal Corporations, Secs. 200, 244; People vs. Bearfield, 35 Barbour N. Y. 254.

The learned author just quoted refers to a decision of our own Supreme Court, which is very aptly in point. State vs. Ramos, 10 An. 420. The opinion in that case is a complete refutation of respondent's argument on this point, and unequivocally asserts the doctrine which we have just quoted.

The provision touching the limited effect of the impeachment, in the present Charter, reads: "Judgments in cases of impeachment shall not extend further than removal from office and disqualification from holding any office under the City Charter, etc." Sec. 62 of Act 20 of 1882.

A strenuous attempt is made to establish a difference between that case and the present controversy, founded on the discrepancy on this subject, between the provisions of the Constitution of 1852 then in force, and those of the present Constitution. Art. 92 of the latter contains a delegation of powers identically similar to those enumerated in Article 124 of the organic law of 1852, on which the Court justified the power of impeachment conferred in the City Charter then in force.

Respondent further contends that the restriction in Article 197 of the present Constitution is not found in the Constitution of 1852, or in any previous Constitution of this State, and seeks. for that reason, to avoid the effect of the decision in the Ramos case. The provision reads: "The House of Representatives shall have the sole power of impeachment." The argument is answered by the preceding considerations in this opinion, which go to show that the power delegated in the present City Charter is not the technical impeachment which the Constitution treats of, but is merely a definition of the causes of removal under the inherent power of amotion, and a prescription of the mode of proceeding in such matters.

The whole argument is completely demolished by the following reasoning on this matter of impeachment in the Ramos case: "We think that in this enactment the legislature only gave to the city government such powers as are proper for its police and good administration, and that no Article of the Constitution was invaded thereby." The corresponding provision on the subject, in the Constitution of 1852, is as follows: (Art. 85) "The power of impeachment shall be vested in the House of Representatives." The great difference between the two provisions, so confidently invoked by respondent, is not easily discerned.

We, therefore, feel safe in concluding on this point, that the immunity of the City Council from judicial interference in the exercise of its inherent, as well as delegated power of amotion, is far from being one of the recognized exceptions to which we alluded above; but that it is one of the very functions which should be held free from such interference.

In the recent case of People ex. rel. Dougan vs. District Court of Lake County, in the Supreme Court of Colorado, (Law Reporter, October, No. 15) this principle was pointedly asserted and enforced. The City Council had been prohibited by the District Court from proceeding to try the City Solicitor on charges preferred against him, until further orders from that Court, when application was made for relief by prohibition in the Supreme Court.

That tribunal held : " The examination of charges preferred against the City Solicitor, finding him guilty of malfeasance in office, and removing him therefrom by the City Council, was not the exercise of judicial power." Hence, the Court held that " the District Court had no jurisdiction to control the action of the City Council, and that this fact appeared sufficiently upon the face of the petition presented to it; and it follows that its order, directing the City Council to desist from further proceedings, was absolutely void."

We reach a similar conclusion concerning the injunction issued by the respondent Judge in our case; and we hold that the preliminary injunction, which paralyzed the administrative functions of the City Council of New Orleans, is an absolute nullity. High on Injunctions, Sec. 786 ; Pullman vs. Meyer, 54 Barb. N. Y.

It is worthy of note that in our case, no other relief was asked by the City Treasurer, but an injunction intended to screen him from a trial of the charges preferred against him, and from any interference with his possession of the office which he holds.

This brings us to the consideration of respondent's last proposition, that the wrong complained of by relators is at most an erroneous judgment, and does not justify the use of the writ of prohibition, which is intended by law only to test the jurisdiction *vel non* of the subordinate court.

In our opinion, the word *jurisdiction* implies something more than technical jurisdiction *ratione materiæ et personæ*, as contended for by respondent. The term is defined, from its etymology and derivation, to mean "a speaking of justice or of right." Wells' Jurisdiction of Courts, p. 1.

It therefore implies the power or authority in law to grant the full relief prayed for; and it must, of necessity, imply the scope or

power to reach and hold the persons or parties to be affected by the particular decree to be issued.

But it is fully demonstrated that a city council in the exercise of its inherent or delegated power of amotion of one of its officers is beyond the reach of the injunction process of courts.

Hence, it follows, that a writ thus issued is null and cannot be enforced, and that the proper remedy of the parties, against whom it is directed, is held to apply to a court of competent appellate or supervisory jurisdiction for relief by way of prohibition, in order to restrain the subordinate court from attempting to enforce a void order, involving an illegal usurpation of authority and jurisdiction by the inferior tribunal.

In the case of the State ex rel. Liversey vs. Judge, 34 An. p. 741, this Court held that a writ of this nature, issued by a court having no power to grant such an injunction, is an absolute nullity, and that the condemnation of defendants for contempt of such writ, falls with the injunction the moment such nullity has been pronounced by this Court, and a writ of prohibition, being considered as the proper remedy, was issued in the premises. This doctrine is in perfect accord with the principle announced in the Colorado case just quoted.

It has been held, and we endorse the ruling that, "The province of the writ (of prohibition) is not necessarily confined to cases where the subordinate court is absolutely devoid of jurisdiction, but it also extends to cases where such tribunal, although rightfully entertaining such jurisdiction of the subject matter in controversy, has exceeded its legitimate powers." High's Extraordinary Legal Remedies, Sec. 781; Appo vs. People, 20 N. Y. Reports, 531; Sweet vs. Hulbert, 51 Barbour, 513.

We are therefore clear in our conviction that, in this case, the District Court has wrongfully exceeded the bounds of its jurisdiction, and that the proper and only efficient check is by the writ of prohibition.

This view of the controversy obviates the necessity of passing on the alleged unconstitutionality of the City Charter on the subject of impeachment, which will be disposed of whenever it comes up in a proper proceeding.

Under these conclusions, and under the terms of our provisional order, the writ of mandamus prayed for is stripped of all practical effect, and it must therefore be ignored.

It is therefore ordered and decreed that the alternative writ of mandamus herein be dissolved; and that the provisional writ of prohibition issued herein be made peremptory at respondent's costs.